# United States Court of Appeals

## For the First Circuit

No. 12-1569

THE SAINT CONSULTING GROUP, INC.,

Plaintiff, Appellant,

v.

ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and McConnell, Jr.,[*] District Judge.

Robert D. Cohan with whom Cohan Rasnick Myerson LLP, Jonathan D. Plaut and Chardon Law Offices were on brief for appellant.
Michael F. Perlis with whom Richard R. Johnson, Rachael Shook, Locke Lord LLP, Michael P. Roche and Murphy & Riley, P.C. were on brief for appellee.

November 2, 2012

[*]Of the District of Rhode Island, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  This dispute between The Saint Consulting Group, Inc. ("Saint") and its liability insurer Endurance American Specialty Insurance Company ("Endurance") stems from Endurance's refusal to defend Saint in a lawsuit against Saint in the Northern District of Illinois, <u>Rubloff Dev. Grp.</u> v. <u>SuperValu, Inc.</u>, No. 10-cv-03917, 2012 WL 1032784 (N.D. Ill. Mar. 27, 2012) (the "Rubloff Action").  The district court dismissed Saint's lawsuit against Endurance based on an exclusion in the policy, and Saint now appeals.

The Rubloff Action.  According to the complaint in that action,[1] Saint is a consulting company that advises and advocates for its clients in land use disputes; its work includes gaining approval for its clients' projects and opposing projects to which its clients are opposed.  Saint has developed a niche practice: acting on behalf of rival grocery store chains, it aims to block or delay Wal-Mart stores from opening in a rival's territory.  Calling its operatives "Wal-Mart killers," Saint has allegedly blocked or delayed hundreds of Wal-Mart stores by spurring litigation and regulatory proceedings.

---

[1]The alleged "facts" being recited in describing the Rubloff Action, taken from its complaint, are relevant not because assumed here to be true but because under insurance law the <u>allegations</u> determine whether in this case the insurer is responsible to defend the action.  <u>See, e.g.</u>, <u>Sterilite Corp.</u> v. <u>Cont'l Cas. Co.</u>, 458 N.E.2d 338, 340 (Mass. App. Ct. 1983).

The Rubloff Action centers on Saint's alleged efforts to block two Wal-Mart stores in the Chicago area on behalf of its client SuperValu, Inc. ("SuperValu"). SuperValu, the third-largest grocery retailer in the country, owns Jewel-Osco, a chain of Chicago area grocery stores that competes with Wal-Mart. The Rubloff Action focused on two proposed Wal-Mart stores: one was planned for a shopping center to be built in Mundelein, Illinois; the other, planned for a shopping center to be built in New Lenox, Illinois. Both are in the vicinity of Chicago.

In Mundelein, real estate developer Rubloff Development Group, Inc. and an associated company ("Rubloff Development") agreed with Mundelein officials to annex land for a shopping center; in New Lenox, McVickers Development, LLC and associated entities ("McVickers Development") acquired and later exercised an option to purchase land for a shopping center. Rubloff Development and McVickers Development (collectively, the "Rubloff plaintiffs") each had an agreement with Wal-Mart to sell it a parcel of land in their respective developments for a Wal-Mart store and had agreements or negotiations with other retailers to open stores there.

In or around 2007, SuperValu allegedly hired Saint to lead a campaign to delay or block these two developments in order to hinder Wal-Mart from competing with Jewel-Osco in the Chicago area grocery market. To carry out this mission, Saint's

-3-

representative (Leigh Mayo) organized local landowners to oppose the two new developments; using a pseudonym, he told a false story of his parents supposedly being evicted from their home to make room for a Wal-Mart store and retained a lawyer (William Graft) to represent them, never explaining that both Mayo and Graft were being paid by Saint, and ultimately by SuperValu. Rubloff, 2012 WL 1032784, at *2.

In Mundelein, Graft allegedly initiated several administrative complaints and lawsuits against the Rubloff development starting in 2007; the lawsuits dragged on for years and were ultimately settled in 2011 for $200,000, but the Mundelein development still has not been built and (due to the extreme delay) may never be built. Rubloff, 2012 WL 1032784, at *2. With the New Lenox development, obstacles in obtaining various permits (allegedly caused by Saint's obstructive activities) delayed the development by two years, causing significant losses to McVickers Development.

After Mayo left Saint's employment, he contacted Rubloff Development and, in exchange for payment, turned over thousands of Saint documents detailing Saint's scheme to block the developments. Rubloff, 2012 WL 1032784, at *2. In June 2010, the Rubloff plaintiffs sued Saint and SuperValu in federal district court in Illinois--the Rubloff Action--where the case was assigned to Judge Leinenweber. The initial complaint, as slightly amended a day

-4-

later, focused on the documents Mayo had turned over and which Saint had demanded back.

Claiming that the documents were needed for a lawsuit it intended to bring against Saint and SuperValu, Rubloff Development sought a declaratory judgment that the documents were not privileged and that it need not return them; made a claim for negligent spoliation of evidence alleging that Saint and SuperValu had destroyed documents needed for the lawsuit; and sought injunctive relief to foreclose further destruction of documents. In September 2010, Judge Leinenweber dismissed most of the claims but retained the declaratory relief claim against Saint alone.

The Rubloff plaintiffs then moved in October 2010 for leave to file a proposed Second Amended Complaint and before acting upon it, Judge Leinenweber resolved the retained declaratory relief claim, holding that most of Saint's documents were not privileged. Thereafter, in July 2011, Judge Leinenweber allowed the Second Amended Complaint.[2] This complaint, in which McVickers Development joined as co-plaintiff, greatly expanded the suit. In this new complaint, Rubloff Development and McVickers Development centrally charged Saint and SuperValu with the following:

---

[2]The original proposed Second Amended Complaint tendered in October 2010--which is the one Saint tendered to Endurance in requesting coverage, and is therefore the one relevant to this appeal--differed in slight, and here irrelevant, ways from the one Rubloff Development ultimately filed in July 2011.

-violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (2006), by engaging in a pattern of mail or wire fraud, 18 U.S.C. §§ 1341, 1343, involving deceptions (the Mayo pseudonym and misrepresentations) to hide their involvement in the opposition to the Wal-Mart supermarkets, and conspiracy to violate RICO, 18 U.S.C. § 1962(d);

-conspiracy in restraint of trade under the Sherman Act, 15 U.S.C. § 1, and the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1 (2010), to prevent Wal-Mart from opening stores; and

-tortious interference with prospective economic advantage by disrupting the developers' expected business relationships with Wal-Mart and other tenants or purchasers of space in the shopping centers; common law fraud by the aforementioned deceptive means, and conspiracy to commit the torts listed above.

Two other claims were part of the case: first, Rubloff Development alone made a separate claim alleging abuse of process on the ground that Saint and SuperValu initiated litigation to delay and impose costs on Rubloff Development related to the Mundelein development; and second, the Rubloff plaintiffs reiterated their document-related claims for declaratory relief.

Finally, on top of the original and the newly proposed claims made by the plaintiffs, Saint itself filed counterclaims in the Rubloff Action against Rubloff Development; these claims were directed to the documents that Mayo had turned over to it, and included inducement of breach of fiduciary duty, conversion, replevin, tortious interference with contractual relations, and

misappropriation pursuant to the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1.

On March 27, 2012, Judge Leinenweber issued a decision, dismissing in full all of the Rubloff plaintiffs' claims on a variety of grounds. Rubloff, 2012 WL 1032784, at *1. The antitrust, RICO, and tortious interference claims were dismissed as governed by the Noerr-Pennington doctrine hereafter discussed. See note 4, below. The declaratory judgment claim was dismissed as moot, and the other claims were also dismissed without prejudice to further amendment, id. at *10-13. In addition, Saint's counterclaims relating to the Mayo documents were greatly narrowed. Id. at *13-17.

On June 7, 2012, Rubloff Development filed a Third Amended Complaint reasserting many of the claims with more detailed allegations of fact, aiming to cure deficiencies identified by the court. The litigation remains pending, although the Third Amended Complaint was filed after the expiration of Saint's policy with Endurance and does not figure in this lawsuit.

Saint's Suit Against Endurance. This history now brings us to the insurance coverage dispute that arises out of the Rubloff Action, depends upon its allegations, and is the subject of the separate litigation now before us on appeal. In 2008, Saint obtained from Endurance a liability insurance policy running from November 1, 2008, through November 1, 2009. This policy, which was

later renewed for another year, was in force when the original and First Amended complaints were filed in the Rubloff Action and when the Second Amended Complaint was initially proposed in October 2010.

The policy is labeled as a "Premier Professional Liability Insurance Policy." It is a type of policy often referred to as an "errors and omissions" policy or a "malpractice" policy, which insures firms or individuals against liability from errors and omissions committed in the performance of their professional services. 4 Thomas & Abramovsky, New Appleman on Insurance Law § 25.01[1], at 25-6 (library ed. 2012). Such insurance is common among skilled professionals such as physicians, attorneys, architects, engineers, and accountants. Id. § 25.01[2], at 25-9 - 25-10.

These policies typically cover claims based on performing or failing to perform professional services--claims that are themselves often expressly excluded from commercial general liability policies. Med. Records Assocs. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d 512, 513 & n.1 (1st Cir. 1998). However, Saint's policy contains many exclusions that are common in malpractice policies, such as for bodily injury and property damage, fraud, pollution liability, securities claims, patent claims, and most pertinently, antitrust claims. See 4 Thomas & Abramovsky, supra, § 25.06[1], at 25-57.

Subject to exclusions and a timely demand, the policy in question required Endurance to defend Saint, and provide indemnification of liability found, as to any claim for any "Wrongful Act" committed within the policy period. "Wrongful Act" was defined as "any actual or alleged act, error or omission committed or attempted solely in the performance of or failure to perform Professional Services by an Insured." Saint's "Professional Services" were listed as "[a]dvocacy consulting services including: analysis, strategic planning, research, recommendations, recruiting, organizing, support management and media communication."

Shortly after the Rubloff plaintiffs brought the Rubloff Action, Saint forwarded copies of the complaint and First Amended Complaint to Endurance and requested defense and indemnification; Endurance refused. The same sequence occurred after the Rubloff plaintiffs sought to file the Second Amended Complaint and again the request was refused by Endurance. Thereafter, Saint sent a demand letter under chapter 93A,[3] which Endurance again refused, expressly invoking Exclusion N in the policy. That exclusion provides that the policy does not apply

---

[3]Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. Laws. ch. 93A, § 2, and provides businesses wronged by an unfair trade practice with a cause of action, id. § 11.

to any Claim based upon or arising out of any actual or alleged price fixing, restraint of trade, monopolization or unfair trade practices including actual or alleged violations of the Sherman Anti-Trust Act, the Clayton Act, or any similar provision [of] any state, federal or local statutory law or common law anywhere in the world.

On June 6, 2011, Saint filed the complaint in the present case against Endurance in Massachusetts state court, alleging that Endurance had breached the contract embodied in the written policy by refusing to defend Saint in the Rubloff Action; based on the same conduct, the complaint also charged breach of contract by estoppel and of the implied covenant of good faith and fair dealing, negligence, fraud, negligent misrepresentation, and unfair and deceptive business practices under chapter 93A, § 2. Two other claims--breach of implied-in-fact contract and unjust enrichment-- were included but were abandoned on appeal.

Endurance removed the case to federal district court on diversity grounds, where it was assigned to Judge O'Toole. Three days after the Second Amended Complaint of the Rubloff Action was dismissed in Illinois, Judge O'Toole granted Endurance's motion to dismiss Saint's lawsuit for failure to state a claim. Saint Consulting Grp., Inc. v. Endurance Am. Specialty Ins. Co., 2012 WL 1098429 (D. Mass. Mar. 30, 2012). He held that the antitrust claims in the Rubloff Action were expressly excluded by Exclusion N and that policy coverage was precluded as to the other claims

-10-

because they arose out of Saint's alleged restraint of trade. Id. at *3.

Saint had asserted theories of recovery against Endurance that rested on theories other than breach of contract embodied in the insurance policy. The district court held that they were doomed either by the failure of the breach of contract claim or because Saint had not sufficiently alleged additional facts to make out a claim. Saint, 2012 WL 1098429, at *4-6. The disposition of these theories we defer for later discussion. Saint's appeal followed.

This appeal. Although factual assertions in Saint's complaint are assumed to be true for purposes of evaluating the grant of the motion to dismiss, Lichoulas v. City of Lowell, 555 F.3d 10, 12 n.1 (1st Cir. 2009), the issues before us are virtually all legal issues on which our review would in any event be de novo. In particular, save where extrinsic evidence is relevant, the comparison of a complaint (allegedly triggering a duty to defend) with an insurance policy is ordinarily treated as a matter of law. See Stop & Shop Cos. v. Fed. Ins. Co., 136 F.3d 71, 73 (1st Cir. 1998).

Judge O'Toole assumed that Massachusetts law governs the insurance policy--neither side contests this--and Massachusetts courts in contract cases look to the law of the state with "the most significant relationship to the transaction and the parties .

-11-

. . ." Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 669 (Mass. 1985) (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971)). Saint is a Massachusetts corporation with a principal place of business in Massachusetts; Endurance, a Delaware Corporation, does business in Massachusetts.

In a coverage case, Massachusetts requires that the insured show coverage, and then the burden shifts to the insurer to show that coverage is limited by a separate exception or exclusion. Highlands Ins. Co. v. Aerovox Inc., 676 N.E.2d 801, 804 (Mass. 1997). The duty to defend arises if the complaint is "reasonably susceptible of [an] interpretation" that would fall within the policy, and exclusions "are to be strictly construed," with ambiguities resolved against the insurer. Vappi & Co. v. Aetna Cas. & Sur. Co., 204 N.E.2d 273, 275-76 (Mass. 1965).

The relevant complaints here are the First Amended Complaint and the proposed Second Amended Complaint, because both were tendered to Endurance. See Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 14 (1st Cir. 2002). If even one of the counts in either of the complaints falls within the coverage provisions but outside any exclusion, Endurance would have a duty to defend the entire lawsuit. Norfolk & Dedham Mut. Fire Ins. Co. v. Cleary Consultants, Inc., 958 N.E.2d 853, 862 (Mass. App. Ct. 2011).

Although Saint's own complaint proffers various theories of recovery, the place to begin is with its claim that Endurance violated the contract, represented by the insurance policy, in failing to defend the Rubloff Action. Under the policy that duty could be triggered by either one of the main complaints in that lawsuit but the charges in the Second Amended Complaint are the place to start, partly because Saint's own brief aims primarily at that complaint.

The underpinning of that complaint is the set of factual allegations already recited at length above--and thereafter expressed through various stated theories of recovery in common law tort, antitrust, and otherwise--that Saint and SuperValu engaged in a campaign designed to frustrate feared competition from Wal-Mart. The acts, also recited above, included recruiting local residents to oppose the two shopping centers (in part through the use of deception) and, in the event, substantially delaying both and possibly derailing the construction of one of the two.

Judge O'Toole assumed that the alleged conduct was within the professional services coverage of the policy save as it might be excluded by Exclusion N and then ruled that Exclusion N applied to all of the counts of the Second Amended Complaint. Exclusion N explicitly says that the policy

> shall not apply . . . to any Claim based upon
> or arising out of any . . . actual or alleged
> violations of the Sherman Anti-Trust Act . . .

-13-

or any similar provision [of] any state . . .
law . . . .

Thus, the Rubloff Action counts based on the Sherman Act and the counterpart Illinois statute cannot trigger coverage.

The far more interesting question is whether Exclusion N also reaches counts of the Second Amended Complaint that rely upon the same facts but charge violations of statutes (e.g., RICO) or common law theories (e.g., fraud, interference with prospective economic advantage) that are not limited to and do not expressly identify their target as restraints of trade. If Exclusion N applied only where the count set forth an antitrust or similarly named claim, a count charging a RICO violation or fraud based on the same facts would not fall within the exclusion and foreclose coverage.

However, Exclusion N, in addition to "including" counts denominated as violations of the Sherman Act and like statutes, extends by its terms to any claim "based upon or arising out of any actual or alleged . . . restraint of trade." And Massachusetts case law construes "arising out of" as looking at the character of the behavior alleged in the count and, if it fits the terms of the exclusion, that exclusion governs even though the statute or tort is denominated in different or broader terms. See Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 817 (Mass. 1999).

For example, in Fuller v. First Financial Insurance Co., 858 N.E.2d 288 (Mass. 2006), a property owner carried a liability

-14-

insurance policy excluding claims "arising out of assault or battery," and the court held that the exclusion barred coverage of a judgment against the property owner for negligence for failing to protect the victim from being attacked and kidnapped by a third party while on the property, and eventually raped. Id. at 289-90. The court reasoned that even though the claim was for negligence, the facts alleged showed that the claim arose out of assault and battery--absent which there would have been no injury due to negligence. Id. at 293.

Fuller cited a "general rule that the phrase 'arising out of' is to be read broadly" in liability insurance exclusions, 858 N.E.2d at 293 n.9, and it does not stand alone. Thus, in Bagley, 720 N.E.2d at 816, the court stressed that "[t]he phrase 'arising out of' must be read expansively, incorporating a greater range of causation than that encompassed by proximate cause under tort law." Accord Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000).

It can hardly be disputed that the factual allegations of the Second Amended Complaint allege a conspiracy to forestall competition through misuse of legal proceedings and through deception. And every count in the Rubloff Action that is not itself described as an antitrust claim depends centrally on the alleged existence of such a scheme. Thus, judged by the allegations of the complaint,

-15-

-the deceptions that form the basis of the RICO and common law fraud counts were undertaken in order to stop the shopping centers and prevent Wal-Mart from competing;

-the interference with prospective economic advantage counts were for interfering with prospective contracts to fill the shopping centers, including the contracts with Wal-Mart;

-the abuse of process count was for misusing legal proceedings for the purpose of delaying or blocking the shopping centers so Wal-Mart could not operate from them; and

-the conspiracy counts were for agreement between Saint and SuperValu to do precisely these allegedly anti-competitive things.

Both the facts stated in the Rubloff complaint and the connection between them and the counts are merely allegations, but Exclusion N is triggered where a claim is based upon or arises out of any actual or "alleged" conduct of the anti-competitive character limned in the exclusion. See Sterilite Corp., 458 N.E.2d at 340. And insurance policies covering litigation require the insurer to take responsibility based not on what actually happened--which will be known only at the end of litigation--but what is charged in the complaint.

Saint's brief scarcely engages with this line of reasoning, which is merely an expansion of the more condensed rationale offered by the district court. Instead, bewilderingly, Saint's argument rests on the propositions that the Illinois district court ruled that Saint's alleged conduct was protected

against antitrust scrutiny by the Noerr-Pennington doctrine and, since it was not wrongful conduct, it could not be excluded from coverage by Exclusion N.  This is a non-sequitur.

The Noerr-Pennington doctrine,[4] resting on Supreme Court interpretations of the Sherman Act, reads that statute not to extend to petitions or other representations aimed at legislators, even where the motive and effects are to secure legislation to forestall competition and such efforts use deception and other improper methods.  Although the doctrine was thereafter narrowed in certain respects, see note 4, above, it helps Saint not at all if we assume that the doctrine immunizes all of the alleged conduct in the Second Amended Complaint.

Exclusion N depends not on whether conduct occurred or, if so, whether it was unlawful, but on what the complaint alleged. What was factually alleged in the Second Amended Complaint in no uncertain terms was an anti-competitive scheme and, where the pertinent counts arise out of that alleged scheme, Exclusion N negates coverage.  The exclusion does not depend on whether a

---

[4]E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).  Compare Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 511 (1972) (holding that Noerr-Pennington does not apply to litigation that is a "mere sham" to stifle competition), with Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993) (holding that the sham exception only applies to "objectively baseless" litigation).

successful defense can be advanced: it excludes meritless claims quite as much as ones that may prove successful.

Saint alternatively argues that if activities protected by Noerr-Pennington are excluded, the policy coverage becomes illusory for it because Noerr-Pennington activities comprise such a large portion of its business. That the exclusion substantially reduces coverage does not in any way make the policy illusory under contract law since it still provides coverage for many potential claims related to Saint's activities. Bagley, 720 N.E.2d at 817. Whether Endurance misrepresented the coverage is a different question which brings us to Saint's backup claims.

These backup counts, which effectively seek to hold Endurance liable for the coverage excluded by Exclusion N, also were properly rejected by Judge O'Toole for reasons set forth in his able decision. Importantly, neither the covenant of good faith and fair dealing nor chapter 93A can be used to negate an express provision of a written contract. Saint, 2012 WL 1098429, at *5. As for the negligence claim, it is predicated on a breach of a duty to defend that does not exist in the contract.

Saint's other backup counts--for estoppel, negligent misrepresentation, and fraud--all rest on the notion that Saint sought protection for its core business and its disclosed business included efforts to halt development opposed by its clients. But Exclusion N specifically excludes certain actions and claims

whether or not they comprise core activities of Saint. The "purpose of a policy exclusion is to narrow the scope of coverage." Certain Interested Underwriters at Lloyd's, London v. Stolberg, 680 F.3d 61, 67 (1st Cir. 2012).

As Judge O'Toole pointed out, the complaint does not describe any explicit representation by Endurance that the policy would cover without exclusions all of Saint's core activities, Saint, 2012 WL 1098429, at *4, let alone indicate any disclosure by Saint that such activities included deception and misuse of administrative or judicial proceedings. That Saint may have expected more protection than it got suggests mainly that it may not have read carefully the policy it purchased.

It remains to address the First Amended Complaint. While the Second Amended Complaint sought relief for the anti-competitive scheme itself, the First Amended Complaint was concerned entirely with documents that might be relevant to the substantive claims that the Rubloff plaintiffs ultimately included in the Second Amended Complaint. It was filed because after Mayo turned over the incriminating Saint materials to Rubloff Development, Saint threatened to sue to obtain their return.

The First Amended Complaint purported to assert three different counts:

> -first, a request for a declaration that the materials delivered by Mayo were not privileged and need not be returned to Saint

-19-

(made a case and controversy by Saint's threatened lawsuit to secure their return);

-second, a claim for negligent spoliation of evidence which, under Illinois law, e.g., Boyd v. Travelers Ins. Co., 652 N.E.2d 267, 270 (Ill. 1995), may allow a plaintiff to collect damages where its own substantive claim was frustrated by the other side's negligent destruction of critical evidence;[5] and

-third, a request for an injunction to prevent any further destruction by Saint of relevant materials.

The first and third claims--the declaratory count and the demand for injunctive relief--effectively aimed at preservation of evidence in support of the substantive claims that the complaint stated were to be asserted later. While siding mostly with the Rubloff plaintiffs on the request for declaratory relief, Judge Leinenweber found that a request for injunctive relief standing alone asserted a remedy but not a cause of action. Then, he found the spoliation claim premature since at the time no substantive counts directed to the alleged scheme had been asserted. See note 5, above.

The document claims are not discussed in Judge O'Toole's decision--it is unclear how far they were pressed by Saint in the district court as a basis for arguing that Endurance had breached

---

[5]Illinois law recognizes negligent spoliation of evidence as a subcategory of the broader tort of negligence, but to prevail a plaintiff must show that he would have prevailed in the underlying lawsuit if he had the destroyed evidence. Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 510 (7th Cir. 2007).

-20-

its policy obligations. In our court almost all of Saint's arguments for coverage are aimed at the Second Amended Complaint. But Saint does say almost without explanation that the negligent spoliation claim in the First Amended Complaint is enough to require protection; we will assume dubitante that this argument was preserved since it does not change the outcome.

Endurance may have scanted its response due to the terseness of Saint's reference but Endurance appears to think that the First Amended Complaint is in all events irrelevant because it was superseded by the Second Amended Complaint. However, the First Amended Complaint was tendered to Endurance and representation refused, and it may not help Endurance that the document issues were thereafter resolved by Judge Leinenweber before the Second Amended Complaint was even filed.

Endurance might have argued that the negligent spoliation count was itself "based upon or arising out of" the anti-competitive scheme that was alleged in both amended complaints; but the relationship between the alleged scheme and the "negligent" destruction of documents might appear at least more remote than counts in the Second Amended Complaint, all of which seek under some heading redress for the harm done by the alleged scheme. Anyway, under Massachusetts law an antecedent objection to coverage based on the spoliation count is more straightforward.

The coverage of the malpractice policy is for wrongful acts committed in the performance or failure to perform Saint's "Professional Services," which are defined by Saint itself as "[a]dvocacy consulting services including: analysis, strategic planning, research, recommendations, recruiting, organizing, support management and media communication." For example, if Saint carelessly failed to organize media communication, this negligence would surely be covered.

But in Massachusetts, the "professional services" language is read to cover only claims involving the exercise or failure to exercise professional judgment; and, critically here, "even tasks performed by a professional are not covered [by a professional services policy] if they are 'ordinary' activities 'achievable by those lacking the relevant professional training and expertise.'" Med. Records Assocs., 142 F.3d at 514 (quoting Jefferson Ins. Co. of N.Y. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 677 N.E.2d 225, 230 (Mass. App. Ct. 1997)).

It is hard to see how the "negligent" discarding of old files by a consulting firm qualifies as its performance of "professional services" as that concept is understood in Massachusetts law. Possibly it would be different if the policy holder were a document storage and disposal firm, which negligently discarded documents confided to its care. But that is not the

business in which Saint declared itself to be engaged, and its representation defines the scope of its protection.

Finally, there were references during oral argument to yet other claims which Saint made by counterclaim against Rubloff Development in the Illinois district court action, such as conversion and replevin. Rubloff, 2012 WL 1032784, at *13-17. Whether or not there might be coverage if these claims were brought against Saint is of no matter; the policy covers claims against Saint but not those brought by Saint as a claimant or counter-claimant.

Affirmed.