# United States Court of Appeals
## For the First Circuit

No. 12-1139

LUCIANO MANGANELLA,

Plaintiff,

v.

EVANSTON INSURANCE COMPANY,

Defendant, Third-Party Plaintiff, Appellant,

v.

JASMINE COMPANY, INC.,

Third-Party Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

Harvey Nosowitz, with whom Anderson & Kreiger LLP was on brief, for appellant.
Anthony R. Zelle, with whom Thomas W. Evans and Zelle McDonough & Cohen, LLP were on brief, for appellee.

December 14, 2012

**STAHL, Circuit Judge.** This is the second appeal we have heard regarding an insurance coverage dispute arising from charges of sexual harassment brought by a former employee against Luciano Manganella, the one-time president of Jasmine Company, Inc. See Manganella v. Evanston Ins. Co., ___ F.3d ___, 2012 WL 5907466 (1st Cir. Nov. 27, 2012). After Manganella filed an action against Jasmine's liability insurance provider, Evanston Insurance Co., seeking defense and indemnification for the harassment charges, Evanston filed a third-party complaint against Jasmine itself, requesting a declaratory judgment that it had no duty to defend or indemnify Jasmine for the harassment claims. The district court granted summary judgment on the third-party claims for Jasmine, holding that Evanston had to both defend and indemnify Jasmine. Evanston now appeals part of that ruling. As framed by the parties, the dispute on appeal is whether a finder of fact must conclude that the conduct underlying the sexual harassment charges did or did not begin before Jasmine's insurance policy took effect.[1] Accordingly, our opinion is limited to that question and does not discuss arguments not made by the parties. After careful consideration, we vacate the judgment below and remand the case to the district court.

_____

[1] The parties did not make certain arguments on appeal that were available to them under Massachusetts law. We consider the issues as the parties have presented them. See United States v. Perazza-Mercado, 553 F.3d 65, 69 n.8 (1st Cir. 2009); Thomas v. Eastman Kodak Co., 183 F.3d 38, 62 n.15 (1st Cir. 1999).

-2-

## I.  Facts & Background

Before the events giving rise to this action, Manganella was the president and sole shareholder of Jasmine, a clothing retailer that he founded in the 1970s.  Donna Burgess, whose sexual harassment allegations form the underlying claims here, was Jasmine's human resources manager from 1997 to 2006.

In 1998, a former Jasmine employee, Sonia Bawa, filed claims of sexual harassment against Jasmine based on Manganella's conduct.  Soon thereafter, Jasmine purchased from Evanston the Employment Practices Liability Insurance Policy at issue here ("the Policy").  Jasmine's coverage from Evanston under the Policy consisted of a series of annually renewed one-year installments running from April 1999 through April 2006.  The Policy covers damages (including monetary settlements) "which [Jasmine] shall become legally obligated to pay as a result of [timely made claims], by reason of any Wrongful Employment Practice."  A claim is a "written charge or lawsuit . . . seeking Damages or other relief for a Wrongful Employment Practice."  A Wrongful Employment Practice includes, as relevant here, "conduct of an Insured with respect to . . . [an] employee that allegedly culminated in . . . violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices law."  Importantly, for a resulting claim to be covered, a Wrongful Employment Practice must have "happened" in its "entirety" during

-3-

the policy period or after the retroactive date (here, April 28, 1999).

In July 2005, Manganella sold Jasmine to Lerner New York, Inc. for approximately $30 million. Manganella and Lerner executed a stock purchase agreement to effectuate the sale and an employment agreement under which Manganella would remain Jasmine's president for three years. Under the stock purchase agreement, $7 million of the purchase price was placed in escrow, "as security . . . in the event of" certain types of misconduct by Manganella. A few months after the sale was completed, Jasmine cancelled the final installment of the Policy but purchased an extended reporting period, which allowed for coverage of claims made and reported during the thirty-six months following the cancellation.

In May 2006, further allegations of sexual harassment by Manganella prompted Jasmine to hire an outside investigator, Stier Anderson LLC, which interviewed several employees, including Burgess; she recounted inappropriate comments that Manganella had made in the past. On June 22, 2006, as a result of conduct revealed by the investigation, Manganella was fired. In a letter to Manganella, Lerner accused him of sexually harassing four female employees and downloading sexually explicit images on company computers, all in violation of Lerner's corporate Code of Conduct. A subsequent arbitration between Lerner and Manganella confirmed that he had violated the Code of Conduct by harassing several

-4-

female employees.  See Manganella, 2012 WL 5907466, at *2 (describing the arbitration).

On March 19, 2007, Burgess filed a charge of discrimination against Manganella, Lerner, and Jasmine with the Massachusetts Commission Against Discrimination ("MCAD"). Burgess's MCAD charge alleged that, "[t]hroughout her employment with Jasmine[], Manganella subjected Ms. Burgess to nearly constant physical and verbal sexual harassment," including "inappropriate comments about Ms. Burgess' body, inappropriate touching," and, eventually, coerced sexual activity on five separate occasions. Manganella also threatened Burgess (and others) with physical violence.

Ten days after Burgess filed the MCAD charge, Manganella notified Evanston of her claims and requested coverage.  Less than two weeks later, Evanston sent a letter to Jasmine, denying coverage for Burgess's claims on the ground that it was "apparent" that the harassment alleged by Burgess in the MCAD charge "did not happen in its entirety subsequent to the Retroactive Date, which is April 28, 1999," as required for coverage.

In April 2008, Jasmine settled the MCAD charge with Burgess for $300,000.  As part of the settlement, Burgess provided Jasmine with an affidavit  (the "2008 Affidavit") stating that the "conduct and actions by Mr. Manganella that formed the basis of my allegations of sexual harassment did not begin until in or about

October 1999, and then continued throughout my employment." Burgess's claims against Manganella were settled separately at a later date.

Manganella filed this action against Evanston in July 2009, seeking (among other things) a ruling that Evanston was required under the Policy to defend and indemnify Manganella against Burgess's MCAD charge. Two months later, Evanston filed an answer and a third-party complaint against Manganella and Jasmine, asserting that it had no duty to defend or indemnify either Manganella or Jasmine for Burgess's claims.[2]

After discovery, Manganella and Evanston cross-moved for summary judgment on Manganella's coverage claims. The district court held that Evanston should have at least investigated the MCAD charge before denying coverage, given that it was aware of certain facts (including an affidavit that Burgess filed in Bawa's harassment case) suggesting that Manganella's unlawful conduct may not have begun prior to the Policy's retroactive date. Manganella v. Evanston Ins. Co., 746 F. Supp. 2d 338, 346 (D. Mass. 2010). The court also concluded, however, that the arbitration between Lerner and Manganella had conclusively established that Burgess's MCAD charge fell within the Policy's exclusion of claims based on conduct "committed with wanton, willful, reckless or intentional

---

[2]     Evanston initially named Burgess as a defendant in its third-party complaint, but later voluntarily dismissed its claims against her.

disregard" for the laws underlying those claims.  See id. at 348. The district court thus found that the doctrine of issue preclusion barred Manganella from relitigating that question, and granted summary judgment for Evanston.  Id. at 349.  We recently affirmed that ruling.  See Manganella, 2012 WL 5907466, at *8.

In a subsequent summary judgment opinion, the district court addressed Evanston's third-party claims against Jasmine. Manganella v. Evanston Ins. Co., No. 09-cv-11264-RGS, 2011 WL 5118898 (D. Mass. Oct. 28, 2011).  The court reiterated its earlier holding that Evanston had a duty to at least investigate the MCAD charge before denying coverage.  Id. at *6-7.  Because Evanston had breached the duty to defend, it had "the burden of proving that [Burgess's] claim was not within its policy's coverage."  Id. at *7 (quoting Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 922 (Mass. 1993)) (internal quotation mark omitted).  Evanston failed to carry that burden.  Addressing the issues as framed by the parties, the district court found no genuine dispute of material fact as to whether the conduct underlying Burgess's MCAD charge had begun prior to the Policy's retroactive date of April 28, 1999.  See id. at *5-6.  In the district court's view, Evanston had at most produced a "shard of allegedly contradictory evidence" in the form of an interview memorandum and interrogatory answers filed in connection with the MCAD proceeding, in which Burgess characterized some of Manganella's pre-April 1999 remarks as

offensive in hindsight.  Id. at *5.  The district court did not consider these statements sufficient to create a factual dispute as to the scope of Burgess's harassment claims.  The court thus "determined that Evanston is liable under the Policy for the costs of defending and settling the Burgess claim," and granted summary judgment for Jasmine.  Id. at *8.[3]  Evanston now appeals the ruling that summary judgment was properly entered against it, and that in consequence it must reimburse Jasmine for the settlement with Burgess (but not the holding that it must cover Jasmine's defense costs).

## II.  Analysis

We review a grant of summary judgment de novo, Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012), and will affirm if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, see Fed. R. Civ. P. 56(a).  "Where, as here, we are presented with cross-motions for summary judgment, we 'must view each motion,

---

[3]  In summarizing its findings, the district court suggested that the evidence as to whether Burgess's claims were covered was "in equipoise." 2011 WL 5118898, at *7.  Seizing on this phrase, and other ostensible errors in the district court opinion, Evanston moved for reconsideration, asserting that the court's language showed that it had improperly weighed the evidence and failed to draw inferences in Evanston's favor.  The district court denied that motion, explaining that, although "the word 'equipoise' was not well chosen," the evidence "provides no basis on which a 'fair-minded jury' could return a verdict for [Evanston] on the coverage issue."  Manganella v. Evanston Ins. Co., No. 09-cv-11264-RGS (D. Mass. Nov. 22, 2011) (electronic order).

separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." OneBeacon Am. Ins. Co. v. Commercial Union Assur. Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010)). Because the parties reasonably agree that Massachusetts law governs the Policy, we apply that law. See Bird v. Centennial Ins. Co., 11 F.3d 228, 231 n.5 (1st Cir. 1993); cf. Saint Consulting Grp., Inc. v. Endurance Am. Specialty Ins. Co., Inc., 699 F.3d 544, 550 (1st Cir. 2012) (applying Massachusetts law to an insurance policy where all parties assumed that it applied and the insured corporation was based in Massachusetts).

The dispositive question here, as presented to us, is whether there is any material issue of fact as to whether the conduct giving rise to Burgess's MCAD charge began after the Policy's retroactive date of April 28, 1999. Because the Policy covers only damages (including settlement payments) paid on claims "by reason of" any Wrongful Employment Practice that "happened" in its "entirety" after the retroactive date, the parties agree that Evanston must reimburse Jasmine for its settlement with Burgess only if the course of harassing conduct from which her claims arose began after that date. As the district court concluded (and as Evanston does not dispute on appeal), Evanston's initial failure to investigate and defend the MCAD charge means that it now bears the

burden of proving that the charge lies beyond the Policy's coverage. See Polaroid Corp., 610 N.E.2d at 922.

We begin with Burgess's MCAD charge, which describes in general terms the progression of Manganella's harassing conduct from offensive remarks and unwelcome touching to coerced sexual activity. As to when the harassment began, the charge reports only that Burgess began working at Jasmine in 1997 and that Manganella harassed Burgess "[t]hroughout her employment" there. Thus, the charge lends some support to Evanston's theory that the Wrongful Employment Practice from which Burgess's claims arose included pre-April 1999 conduct; taken literally, the word "throughout" would mean that Burgess was harassed beginning on day one of her employment, i.e., in 1997. That said, the word could also be read to indicate simply that the harassment was pervasive. Indeed, we note that the charge, even when describing particular instances of harassment, is simply not specific as to dates. Thus, we turn to the other evidence to shed more light on the conduct that gave rise to Burgess's claims.

The parties vigorously dispute the significance of various statements in which Burgess has described certain pre-April 1999 sexual comments by Manganella as offensive or unwelcome, or as intended to soften her up for later, more egregious conduct. For example, during her 2006 interview with Stier Anderson, she reported that Manganella had made unwelcome sexual advances toward

her "since early in her employment" and explained that she felt that he had "tried to manipulate her from the beginning."  In March 2009, in response to an interrogatory in the MCAD action that asked her to identify each instance of harassment that she experienced, Burgess related, among other things, that "[w]hen [she] first began working for Jasmine[], Mr. Manganella would make off-color comments on taking Viagra and about his sexual relations with his wife." She explained that these comments made her "uncomfortable" but that she "did not feel personally threatened by them."  Similarly, at a 2011 deposition in this action, Burgess testified that Manganella had made sexual comments in 1997; at the time, they made her uncomfortable but she did not find them threatening.  By 1999, however, she viewed the comments as threatening in hindsight and felt that they had been intended to set her up.

Considered in the light most favorable to Jasmine, none of these statements necessarily shows that the conduct giving rise to Burgess's MCAD charge began before April 28, 1999.  That Manganella's early comments made Burgess "uncomfortable" does not, without more, establish that they contributed to the hostile environment that resulted in the MCAD charge.  This conclusion would be consistent with Burgess's statement, in a November 1998 affidavit she submitted in Bawa's discrimination case, that "at no time" had Burgess "ever witnessed or heard from anyone associated with the company . . . that Mr. Manganella committed any acts of

-11-

sexual harassment directed towards Ms. Bawa or others." Likewise, that Burgess offered Manganella's comments as part of her answer to an interrogatory asking her to list instances of sexual harassment does not necessarily show that her claims arose in part from these comments, given that she went on to clarify that she did not find the comments threatening, which could suggest that they did not contribute to the hostile environment that gave rise to her claims.

Conversely, when viewed in the light most favorable to Evanston, these statements could support the inference that the harassing conduct giving rise to Burgess's claims did include Manganella's pre-April 1999 remarks. That Burgess did not feel "threatened" by Manganella's comments at the time they were made -- or did not believe that she was aware of sexual harassment on his part at the time, as stated in the 1998 affidavit -- does not necessarily mean that those remarks did not ultimately contribute to a hostile, sexually harassing work environment. "Incidents of sexual harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and many incidents in isolation may not be serious enough for complaint." Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 937 (Mass. 2001). Thus, a reasonable factfinder could conclude that Manganella's offensive sexual comments, while perhaps "not . . . serious enough for complaint" when made, were ultimately part of the broader pattern of harassing, unlawful conduct that gave rise

-12-

to Burgess's claims.  See id. at 941 ("A hostile work environment constitutes a pattern of sexual harassment . . . that, by its very nature, often is apparent only in hindsight.").  That conclusion would find support in the fact that Burgess answered an interrogatory asking about instances of sexual harassment by identifying these comments (albeit with the clarification discussed above), and in her statements that Manganella had set her up and "tried to manipulate her from the beginning."[4]

So far, then, we have a stalemate.  Considering the two motions separately and drawing all reasonable inferences in favor of the non-movant, see OneBeacon, 684 F.3d at 241, we do not believe that the undisputed facts entitle either party to judgment as a matter of law.  Rather, the MCAD charge and Burgess's various descriptions of Manganella's sexual comments support the sort of "conflicting yet plausible inferences" that make summary judgment improper.  See Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 764 (1st Cir. 1994); see also Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (explaining that "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage").

---

[4]  We note these descriptions by Burgess not because her subjective understanding of the scope of her claims controls the question before us, but rather because the effect of Manganella's remarks on Burgess may be relevant to whether those remarks contributed to the hostile environment from which her claims arose.

Nor do we believe that this stalemate is broken by Burgess's 2008 Affidavit, which states that the "conduct and actions by Mr. Manganella that formed the basis of [Burgess's] allegations of sexual harassment did not begin until in or about October 1999, and then continued throughout [her] employment." Although we do not agree with Evanston that Preferred Mutual Insurance Co. v. Gamache, 675 N.E.2d 438 (Mass. App. Ct.), aff'd, 686 N.E.2d 989 (Mass. 1997), requires us to entirely disregard the affidavit,[5] we do understand Evanston's concern over the prospect of claimants and insureds colluding against insurers by swapping such statements for settlement money. More importantly, the affidavit is not admissible because it is not relevant to any issue before us on this appeal. The affidavit goes to Burgess's subjective intent, but her subjective intent is not relevant.

Further, even if the 2008 Affidavit were relevant here, it could not provide a basis for summary judgment in Jasmine's

---

[5] Evanston argues that Gamache stands for the proposition that "characterizations of the underlying claim agreed to by the insured and the claimant in settling the underlying claim have no weight in subsequent coverage litigation." That case, however, simply declined to give preclusive effect to a stipulation between a claimant and an insured in a subsequent action between the insured and the insurer. See 675 N.E.2d at 444 n.10. Because the stipulation was not material to the underlying judgment, it lay outside the long-standing Massachusetts rule that "[w]here an action against the insured is ostensibly within the terms of the policy, the insurer . . . is bound by the result of that action as to all matters therein decided which are material to recovery by the insured in an action on the policy." Miller v. U.S. Fid. & Cas. Co., 197 N.E. 75, 77 (Mass. 1935); accord Lodge v. Bern, 101 N.E.2d 748, 749 (Mass. 1951); see Gamache, 675 N.E.2d at 444 n.10.

-14-

favor because a reasonable factfinder could disbelieve it. Our decision in another insurance coverage dispute, Blanchard v. Peerless Insurance Co., 958 F.2d 483 (1st Cir. 1992), illustrates why. There, the crucial question was whether Paul, who shot the claimant, Blanchard, with a pellet gun, intended to reside in his parents' home in the future (which would make him a "resident" for the purposes of their homeowners' insurance policy). See id. at 484, 486. This court reversed a grant of summary judgment for the insurer that was based in part on Paul's deposition testimony that he had no intention of returning to his parents' home, explaining:

> "State of mind" testimony from the putative "covered person" may raise inherent credibility concerns insofar as it supports limitations on third-party beneficiary coverage in the somewhat unusual circumstances where the financial interests of an insurer and its insured are aligned. Blanchard specifically points to undisputed evidence from which a jury might reasonably infer that Paul's statements as to his subjective intent were motivated by self-interest. Were a jury to credit Blanchard's evidence, it would be entitled to infer that Paul did not harbor the intent to which he testified on deposition.

Id. at 490-91.[6] Here, of course, it is not the insured and insurer whose financial interests are aligned, but rather the claimant and the insured. Nevertheless, the same credibility concerns are

---

[6] The relevant evidence in Blanchard suggested that Paul had a motive to dissemble about his intention to return to his parents' home because their insurance premiums would increase if the claimant prevailed against the insurer in the action on the parents' policy. See 958 F.2d at 490 n.10.

present here; Burgess provided Jasmine with the 2008 Affidavit as a condition of the settlement in which she received $300,000. Moreover, as explained above (and as was true in Blanchard, see id. at 490 n.10), there is other evidence in the record that, when construed in Evanston's favor, would suggest that Burgess's subjective intent was not as she subsequently described it in the 2008 Affidavit. Thus, even if the affidavit were relevant here, we would set it aside for the purposes of resolving Jasmine's motion because a reasonable factfinder could refuse to credit it. See id. at 491 (giving the disputed statements "no weight" in resolving the summary judgment motion of the party relying on them).[7]

In sum, we hold that neither party is entitled to summary judgment. As described above, the remaining evidence before us can support the sort of divergent but plausible inferences as to a key issue that make summary judgment unavailable. See Desmond, 37 F.3d at 764. Indeed, we believe that, on this record and as the issues have been framed, the question of when the harassing conduct that gave rise to Burgess's claims began is a quintessential question for a factfinder.

One final point warrants brief mention: our conclusion that neither party is entitled to summary judgment is not affected

---

[7]    The same would not be true, of course, for the purposes of resolving Evanston's motion, because the "evidence of the non-movant is to be believed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Here, though, the 2008 Affidavit is not relevant and thus does not impact our decision anyway.

-16-

by the fact -- emphasized by Evanston -- that the Policy defines "Wrongful Employment Practice" to mean conduct that "allegedly culminated in" a violation of law.  Certainly, drawing all inferences in Evanston's favor, one could see the evidence discussed above as establishing that Manganella's pre-April 1999 remarks were part of a single course of sexually harassing conduct that "culminated in" the events at the heart of Burgess's harassment claims.  But, as we have already explained, when all inferences are drawn in Jasmine's favor, it is possible to see these comments as simply separate from the Wrongful Employment Practice that gave rise to Burgess's MCAD charge.  And Evanston has not attempted to show that "an objectively reasonable insured, reading the relevant policy language," Finn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 896 N.E.2d 1272, 1277 (Mass. 2008) (citation omitted), would expect the phrase "allegedly culminated in" to bar coverage of Burgess's claims even if those claims arose from a Wrongful Employment Practice that did not encompass Manganella's early comments.  Further, to the extent that this phrase is ambiguous, we construe that ambiguity "against the insurer . . . and in favor of the insured." GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) (citing Hazen Paper Co. v. U.S. Fid. & Guar. Co., 555 N.E.2d 576, 583 (Mass. 1990)).  Thus, the Policy's use of "culminated in" does not entitle Evanston to summary judgment.

### III.  Conclusion

For the foregoing reasons, we <u>vacate</u> the judgment below and <u>remand</u> for further proceedings consistent with this opinion. No costs are awarded.