**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 31, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY, a
Missouri corporation,

     Plaintiff-Counter-Defendant -
     Appellant,

v.

UNITED SPECIALTY INSURANCE
COMPANY, a Delaware corporation,

     Defendant-Counter-Claimant -
     Appellee.

No. 12-2178
(D.C. No. 1:11-CV-01137-LFG-RHS)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **HOLLOWAY**[**] and **HOLMES**, Circuit Judges.

---

     [*]     This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

     [**]     The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, heard oral argument in this case, but passed away prior to the case's final resolution. Judge Holloway did not cast a vote regarding this order and judgment, and he had no role in the preparation thereof. "The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (noting that a circuit court may adopt procedures permitting disposition of an appeal where a remaining quorum of a panel agrees on the disposition). Consequently, the remaining panel members have acted as a quorum with respect to this appeal and, for the reasons explicated below, have voted to **reverse** and **remand** for further proceedings.

American National Property and Casualty Company ("American") and United Specialty Insurance Company ("United") dispute their respective obligations flowing from a wrongful-death settlement. On summary judgment, the district court ruled that United had no obligation to pay. We conclude that United has not made the showing to warrant that result. Accordingly, we use the jurisdiction granted to us by 28 U.S.C. § 1291 to **reverse** and **remand** for further proceedings.

## I

## A

"In reviewing the district court's grant of summary judgment, we recite the facts in the light most favorable to [American], the nonmoving party." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 647 n.2 (10th Cir. 2013), *cert. denied*, --- U.S. ----, 134 S. Ct. 2664 (2014).

At the time of the underlying events, Endeavor Services, Inc. ("Endeavor") was in the business of transporting water to oil fields. Jimmy Cooper financed the company at its inception and served as its director while his children jointly owned 51% of its shares and Virgil Woods owned the other 49%.

To assist the company, Mr. Cooper provided it the use of his Lincoln Navigator ("the Navigator"). The Coopers used the Navigator as a family vehicle from 2004 until 2010. At that time, Mr. Woods informed Mr. Cooper that Edward

De La Paz, an Endeavor salesman, needed a vehicle to perform his duties, and Mr. Cooper offered the Navigator. There was no discussion of Endeavor purchasing the vehicle when Mr. Cooper first provided it, but approximately a month later Messrs. Woods and Cooper agreed that Endeavor would buy the Navigator at fair market value as soon as the company had the funds to do so. While it had possession of the Navigator, Endeavor paid for all gas and maintenance. Mr. Cooper continued to pay the premiums on the car's insurance and retained title to the vehicle, but he and his wife never used it.

On June 11, 2010, Mr. De La Paz was driving the Navigator to pick up a check that would have allowed Endeavor to pay Mr. Cooper for the vehicle.[1] Mr. De La Paz crashed into a truck, killing both himself and Roland Judson, the truck driver. The accident occurred approximately fifty miles from Mr. De La Paz's house—where he began his drive—during daylight, with clear conditions, on a dry, straight, level road. A police report characterized "[d]river inattention" as "a contributing factor in the crash." Aplt. App. at 78 (Crash Report, dated July 8, 2010). An autopsy of Mr. De La Paz found methamphetamine in his system in an amount sufficient to cause death by overdose. In the opinion of Dr. Richard Morrisett, a neuropharmacologist retained by American, drugs "rendered [Mr. De La Paz] incapable of safe operation of a motor vehicle [and] substantially

---

[1] Mr. Cooper was unaware of this plan and thought the purchasing date was at least six months in the future.

3

contributed to the motor vehicle accident." *Id.* at 152 (Letter from Richard Morrisett to Christopher Reed, filed June 5, 2012).

**B**

There are three different insurance policies relevant to the appeal: (1) a family auto policy issued by American to Mr. Cooper; (2) a commercial umbrella policy issued by American to Mr. Cooper; and (3) a commercial auto policy issued by Great West Casualty Company ("Great West") to Endeavor. The most important aspect of Mr. Cooper's family policy with American, for our purposes, is that it excluded coverage for damages incurred "while any insured vehicle is rented, leased, or subleased or under any purchase agreement or conditional sale to others." *Id.* at 102 (Family Auto Policy, filed June 5, 2012). As for the commercial umbrella policy American issued to Mr. Cooper, its pertinent provision excluded coverage for damages "[a]rising out of the use . . . or possession by any person of a controlled substance." *Id.* at 105 (Commercial Umbrella Policy, filed June 5, 2012). Finally, the commercial auto policy Great West issued to Endeavor indicated, notably, that it applied only to "covered autos," which included "hired autos" and "nonowned autos." *Id.* at 126–27 (Commercial Auto Policy, filed June 5, 2012).

Mr. Judson's estate sued Mr. De La Paz's for wrongful death. A settlement was reached between the insurance companies, Mr. Judson's estate, and Mr. De La Paz's estate, whereby Mr. Judson's estate would be paid $1,650,000 to resolve

4

its wrongful-death claim. Of this amount, American paid $650,000, Great West paid $1,000,000, and United—which issued an excess-liability policy to Endeavor—paid nothing. The insurance companies each reserved their right to contest the claims amongst themselves.

American exercised that right, seeking a declaratory judgment and equitable subrogation on the ground that United owed it $650,000 ("the loss") for the money it paid to settle the wrongful-death lawsuit based on the excess-liability policy it issued to Endeavor.[2] Both parties filed motions for summary judgment. In its motion, American argued that neither its own family auto policy nor its umbrella policy covered the loss. It sought a declaration that the Great West policy provided primary coverage, that United provided excess coverage, and that United therefore owed American $650,000 for the amount American paid to settle the claim over and above the $1,000,000 that Great West paid. For its part, United argued in its own motion for summary judgment that American's family auto and umbrella policies covered the loss.

Ruling on the dueling motions for summary judgment, the district court granted United's, denied American's, and dismissed the complaint with prejudice. In so doing, it declared that American's auto and umbrella policies covered the

---

[2]      American initially sued Great West as well, but it was dismissed from the lawsuit with prejudice by stipulation of the parties and is not participating in this appeal.

5

loss and that Great West's and United's policies did not. The district court reasoned as follows. With respect to American's family policy, the district court found the conditional-sale exclusion ambiguous and thus properly construed against American, the insurer. The district court explained that "[a]t most," the arrangement "amounted to an expression of a *plan* for Endeavor to purchase the vehicle at some undefined time and for an unstated sales price, rather than a contractual agreement." *Id.* at 372 (Mem. Op. & Order, filed Sept. 24, 2012). As such, the terms were insufficiently definite to constitute a contract, and the conditional-sale exclusion was not implicated.

Turning to American's commercial umbrella policy, the district court concluded that its exclusion for damages arising out of the use of controlled substances was, like the conditional-sale exclusion, ambiguous, and the court accordingly resolved its ambiguities in United's favor. As the district court read the record, the summary-judgment evidence indicated at most that Mr. "De La Paz's methamphetamine use *might* have caused the accident." *Id.* at 378. That did not satisfy the district court, as "a number of other factors leading to De La [Paz's] inattentive and dangerous driving could have caused the collision." *Id.* at 379.

As for the Great West policy, the district court found that Great West was not obligated to cover the loss because the Navigator was borrowed, and was therefore not a "hired auto" or a "nonowned auto" within the meaning of the

6

policy. In view of those findings, the district court granted United's motion for summary judgment, denied American's motion for summary judgment, and dismissed the complaint with prejudice. This timely appeal followed.

**II**

Because this case is here on summary judgment, we apply a de novo standard of review, using the same methodology as the district court. *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). A party is entitled to summary judgment only where the summary-judgment record shows no genuine issue of material fact. *Id.* In making that determination, we consider the facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *See Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013).

With diversity cases such as this, substantive questions are governed by state law. *See, e.g.*, *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1203 (10th Cir.), *cert. denied*, --- U.S. ----, 133 S. Ct. 413 (2012). The parties agree that state law controls each of the issues presented, and they are correct. *See Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1303 (10th Cir. 2011) (applying state law to insurance coverage question in diversity case). The parties further agree, as did the district court, that New Mexico law controls, so we can safely apply that law. *See N. Am. Specialty Ins. Co. v. Corr. Med. Servs., Inc.*, 527 F.3d 1033, 1040 n.5 (10th Cir. 2008) (applying Missouri

7

law in an insurance case because the district court applied it and because the parties did not dispute that decision on appeal, as "appellate courts do not normally address choice of law issues sua sponte where [the] parties acquiesce in application of a certain state's law"). "[O]ur task in diversity cases is to predict how the state supreme court would rule." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1093 (10th Cir. 2010).

### III

As we have indicated, at the center of the case are three different insurance policies: (1) the family auto policy issued by American to Mr. Cooper; (2) the commercial umbrella policy issued by American to Mr. Cooper; and (3) the commercial auto policy issued by Great West to Endeavor. The district court ruled on summary judgment that: (1) American's family auto policy covered the loss; (2) American's umbrella policy covered the loss; and (3) Great West's policy did not cover the loss. We reach a different outcome from the district court's on each policy. Specifically, we conclude that: (1) United was not entitled to a summary-judgment ruling that American's family auto policy covered the loss; (2) United was not entitled to a summary-judgment ruling that American's umbrella policy covered the loss; and (3) United was not entitled to a summary-judgment ruling that Great West's policy did not cover the loss. As a result, we reverse the entry of summary judgment and remand for further

8

proceedings.[3]

# A

The first issue presented is whether United was entitled to a summary-judgment ruling that American's family auto policy covered the loss because the conditional-sale exclusion is inapplicable. We hold that it was not, and reverse the district court insofar as it reached the contrary result.

# 1

---

[3] American asks us to remand with instructions for the district court to enter summary judgment in its favor. We enjoy the power to do so, *see McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993), but believe the more prudent course under the circumstances is to simply reverse the grant of summary judgment in favor of United. New Mexico law holds that "[i]t is the duty of the court to interpret the terms of a contract when these terms have been clearly established but when the terms of a contract are in controversy, it is for the jury to determine the terms and it is not the province of the court to instruct the jury what the terms are." *Segura v. Molycorp, Inc.*, 636 P.2d 284, 289 (N.M. 1981). It is clear that there is an insufficient basis to grant summary judgment in United's favor on the issues addressed herein, while considering the facts in the light most favorable to American, the nonmovant, and making all reasonable inferences in its favor. *See Talavera*, 725 F.3d at 1267. That said, in addressing the question of whether summary judgment is properly granted *against* United on these issues, we must give United the benefit of the standard of review applicable to the nonmovant. *See, e.g.*, *Manganella v. Evanston Ins. Co.*, 702 F.3d 68, 72 (1st Cir. 2012) (discussing how standard of review on cross-motions for summary judgment depends on which motion is being considered). Affording United that benefit, it is less certain whether there is a sufficient basis for granting summary judgment against it, and the district court has not had an opportunity to pass upon that question with the benefit of the analysis we conduct below. For those reasons, the better course is to simply reverse the district court's grant of summary judgment for United and remand the case for the district court to consider the proper steps to take going forward. We neither state nor imply any view on what those steps should be.

In New Mexico, "insurance contracts are construed by the same principles which govern the interpretation of all contracts." *Dairyland Ins. Co. v. Herman*, 954 P.2d 56, 60 (N.M. 1997) (quoting *Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 976 (N.M. 1997)) (internal quotation marks omitted). However, "[e]xclusionary clauses in insurance policies are to be narrowly construed, with the reasonable expectations of the insured providing the basis for our analysis." *Knowles v. United Servs. Auto. Ass'n*, 832 P.2d 394, 396 (N.M. 1992) (internal citation omitted).

Where a policy term is unambiguous, our duty is simply to apply it to the facts of the case. *See Ponder v. State Farm Mut. Auto. Ins. Co.*, 12 P.3d 960, 964 (N.M. 2000) ("[W]hen the policy language is clear and unambiguous, we must give effect to the contract and enforce it as written."). New Mexico law deems a policy term ambiguous where it "is 'reasonably and fairly susceptible of different constructions.'" *Sanchez v. Herrera*, 783 P.2d 465, 469 (N.M. 1989) (quoting *Levenson v. Mobley*, 744 P.2d 174, 176 (N.M. 1987)). "The question of whether an ambiguity [in an insurance policy] exists is a question of law to be decided by the court." *Richardson v. Farmers Ins. Co. of Ariz.*, 811 P.2d 571, 572 (N.M. 1991). A policy clause can be ambiguous either facially or as applied. *See Rummel*, 945 P.2d at 982.

10

**a**

United contends that the conditional-sale exclusion is ambiguous, and the district court agreed. We respectfully beg to differ.

Beginning with the issue of facial ambiguity, the policy does not define the term "conditional sale." In such cases, "the term must be interpreted in its usual, ordinary, and popular sense." *Battishill v. Farmers Alliance Ins. Co.*, 127 P.3d 1111, 1113 (N.M. 2006) (internal quotation marks omitted). Dictionaries can assist us in that task. *See id.* One layman's dictionary defines a conditional sale as "a sale in which the vesting of title in the purchaser notwithstanding delivery to him is made to depend upon the due performance of conditions (as payment in full) made a part of the terms of sale." *Webster's Third New Int'l Dictionary* 473 (2002) [hereinafter "*Webster's*"]. The definition provided by the preeminent legal dictionary is in accord. *See Black's Law Dictionary* 1454 (9th ed. 2009) [hereinafter "*Black's*"] (defining a conditional sale as "[a] sale in which the buyer gains immediate possession but the seller retains title until the buyer performs a condition, esp[ecially] payment of the full purchase price").

Although the New Mexico courts do not appear to have defined conditional sales, they have referred to them in numerous cases, and have never expressed confusion as to what they are. *See, e.g.*, *MGIC Mortg. Corp. v. Bowen*, 572 P.2d 547, 548–49 (N.M. 1977); *Toulouse v. Chilili Coop. Ass'n*, 770 P.2d 542, 544 (N.M. Ct. App. 1989). The closest the New Mexico Supreme Court has come to

11

defining conditional-sales contracts is to explain that their purpose "is to give the seller security for the purchase price of property agreed to be sold by the terms of the instrument." *Joe Heaston Tractor & Implement Co. v. Claussen*, 287 P.2d 57, 59 (N.M. 1955).[4] Presumably the "security" referred to is the owner's retention of the title, and *Joe Heaston*'s explanation of the purpose of the conditional sale is therefore fully consistent with the dictionary definitions mentioned above.[5]

Furthermore, as American helpfully points out, the phrase "conditional sale" appears in a number of New Mexico statutes and regulations. Most

---

[4]    As a point of clarification, United understands *Joe Heaston* to have equated conditional sales with "chattel mortgages." Aplee. Br. at 26. The case actually did the opposite: it contrasted and distinguished conditional sales and chattel mortgages. *See Joe Heaston*, 287 P.2d at 59 ("Because of the harsh remedies available to the holders of conditional sale contracts, they are not favored in the law. In case of doubt, the courts hold the instruments in question to be chattel mortgages." (internal citation omitted)); *id.* ("[T]he seller must be the actual owner of the article sold before a conditional sale contract is valid as such; *otherwise*, it is held to be a mortgage." (emphasis added)).

[5]    American asserts that this court, "interpreting New Mexico law, defined the term conditional sale, as used in an automobile insurance policy, as . . . '[a sale] in which title was retained as security for payment of the amount due.'" Aplt. Opening Br. at 25 (quoting *Commercial Standard Ins. Co. v. McCollum*, 207 F.2d 768, 769 (10th Cir. 1953)) (internal quotation marks omitted). The full passage reads, "*Appellant*, however, *contends* that the surrounding facts and circumstances refute these findings and compel the conclusion that there was a sale on credit or in any event a conditional sale, in which title was retained as security for payment of the amount due." *McCollum*, 207 F.2d at 769 (emphases added). Read in its entirety, the sentence is plainly summarizing an argument, not setting forth a definition. Nevertheless, it does add weight to American's position that the term "conditional sale" is typically understood by courts and parties, including in cases hinging on New Mexico law, as tracking the definitions discussed above.

12

compellingly, a provision of New Mexico's motor vehicle code indicates that

> "owner" means a person who holds the legal title of a vehicle and may include, . . . in the event that a vehicle is the subject of an agreement for conditional sale or lease *with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee*, . . . such conditional vendee.

N.M. Stat. Ann. § 66-1-4.13(F) (emphasis added). Again, this language is very much in keeping with the foregoing dictionary definitions and with the New Mexico Supreme Court's description of conditional sales in *Joe Heaston*.

To be sure, the sources surveyed above do not constitute controlling state "law directly on point," and we are thus "free to consider all resources available, including . . . other state courts and federal courts, in addition to the general weight and trend of authority." *FDIC v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000). A review of that authority confirms that our reading of New Mexico law is harmonious with mainstream jurisprudence. With minor and irrelevant variations, a long and consistent body of caselaw from around the country supports the notion that a conditional sale is one in which (1) the buyer gets immediate possession, and (2) the seller keeps title, until (3) the buyer pays in full. *See, e.g.*, *Alger v. Davis*, 76 N.W.2d 847, 850 (Mich. 1956) ("A conditional sale is an agreement for the sale of a chattel, in which the vendee undertakes to pay the price, and possession of the chattel is immediately given to the vendee, but the title to the same is retained by the vendor until the purchase price is paid,

13

when it passes to the vendee." (quoting *In re Parkstone Apartment Co.*, 220 N.W.

780, 781 (Mich. 1928)) (internal quotation marks omitted)); *Nev. Refining Co. v.*

*Newton*, 497 P.2d 887, 889 (Nev. 1972) ("The essence of a conditional sales

contract is that the seller shall retain and not relinquish title to the property the

subject of the sale until the buyer pays in full the agreed purchase price."); *see*

*generally* R.P. Davis, *What Amounts to Conditional Sale*, 175 A.L.R. 1366 (1948)

(collecting cases and finding that "one of the essential elements and

distinguishing features of a conditional sale is the reservation of title in the seller

until the performance of some condition or the happening of some contingency,

usually the full payment of the purchase price").[6]

In short, the conditional sale is a well-established concept, both within and

outside the law, and both within and outside New Mexico. It is a simple,

straightforward idea with clear, comprehensible terms. We see nothing facially

ambiguous about it.

---

[6]     United points to purported uncertainty in caselaw regarding
conditional sales as evidence of ambiguity. It says that in some jurisdictions
ownership is retained until payment in full is received, whereas in others
ownership passes with possession. As examples of the supposedly "diverging
definitions" of conditional sales, United cites only cases from Kentucky and
Louisiana. Aplee. Br. at 26. Given that New Mexico statutory and common law
reflect the definitions that are supported by dictionaries and by the weight of
authority, this supposed conflict is irrelevant.

14

**b**

That leaves the possibility that the conditional-sale exclusion is "ambiguous upon application to a particular circumstance." *Rummel*, 945 P.2d at 982. The provision is no more ambiguous in this specific context than it is in the abstract.

First, the context of the policy as a whole *strengthens* the conclusion that the provision is unambiguous, rather than injecting ambiguity into it. *See Battishill*, 127 P.3d at 1115 (considering the policy in context to confirm the plain-language reading of the terms at issue). The provision at issue excludes coverage "while any insured vehicle is rented, leased, or subleased or under any purchase agreement or conditional sale to others." Aplt. App. at 102. It is not difficult to see the theme uniting these terms: American did not wish to insure the vehicle to one individual whose risk it could estimate and then have that individual turn around and profit by allowing another person, unknown to American, to drive and potentially damage the vehicle, thereby obliging American to pay for the consequences.

This contextual analysis confirms the intent of the parties. *See Ponder*, 12 P.3d at 964 ("Our analysis of the insurance policy proceeds with the primary goal of 'ascertain[ing] the intentions of the contracting parties with respect to the challenged terms at the time they executed the contract.'" (alteration in original)

15

(quoting *Strata Prod. Co. v. Mercury Exploration Co.*, 916 P.2d 822, 830 (N.M. 1996))); *Brown v. Am. Bank of Commerce*, 441 P.2d 751, 755 (N.M. 1968) ("[A] contract should be interpreted as a harmonious whol[e] to effectuate the intentions of the parties, and every word, phrase or part of a contract should be given meaning and significance according to its importance in [the] context of the contract.").

Second, to the extent that United argues that either the alternative dictionary definitions of conditional sales or the supposed conflict in caselaw regarding the concept renders the term ambiguous as applied, it is mistaken.

As respects the dictionary definitions, United emphasizes that, in addition to the first definition discussed above, *Black's* lists two others: "[a] sale accompanied by an agreement to resell upon specified terms," and "[a] contract for the sale of goods under which the buyer makes periodic payments and the seller retains title to or a security interest in the goods." Aplee. Br. at 25 (quoting *Black's Law Dictionary* 1337 (7th ed. 1999)) (internal quotation marks omitted). There is clearly only one definition, however, that has any relevance; it is the first definition—the one that is fully consistent with well-established New Mexico decisional and statutory law, a longstanding corpus from other jurisdictions, and the obvious purpose of the provision. The alternative definitions do not render the provision ambiguous as applied.

Turning to a supposed jurisprudential conflict, United avers that, in some

16

jurisdictions, when an object is conditionally sold, ownership is retained until payment in full is received, whereas in others ownership passes with possession. The precise wording of the policy terms here moots the alleged conflict. Recall that the policy excluded damages incurred "while any insured vehicle is . . . *under any . . . conditional sale to others.*" Aplt. App. at 102 (emphasis added). "Under" is most naturally read here as synonymous with "subject to." A vehicle is presumably subject to a conditional sale as soon as an agreement has been reached that it is being sold. *Cf. Lloyd's of London v. Walker*, 716 S.W.2d 99, 105 (Tex. App. 1986) (noting that equipment was "sold originally *under* conditional sales contracts and *was not fully paid for*" (emphases added)). In other words, it does not matter when ownership passes for purposes of applying the policy; what matters is when the agreement is reached. Thus, any lack of uniformity regarding the passage of ownership has no bearing on the conditional-sale exclusion. In sum, the exclusion is unambiguous, both facially and as applied.

**2**

Having found no ambiguity, our duty is simply to apply the exclusion to the facts of the case. *See Ponder*, 12 P.3d at 964 ("[W]hen the policy language is clear and unambiguous, we must give effect to the contract and enforce it as written."). To return to the definition derived above, a conditional sale is one in which (1) the buyer gets immediate possession, and (2) the seller keeps title, until

17

(3) the buyer pays in full. Applying the more specific language of the policy, i.e., the word "under," the question is whether the *agreement* to enter such an arrangement had been reached.

The answer is yes. There is no dispute that Endeavor acquired immediate possession of the Navigator while Mr. Cooper retained title until Endeavor paid him the full purchase price. Under the plain language of the insurance policy, the Navigator was subject to a conditional sale on the day of the accident.

Protesting this conclusion, United lines up the facts of the case with the traditional elements of a contract to show a gap between the two. More specifically, United considers the agreement too indefinite to constitute a contract of any kind, including a conditional-sales contract. It agrees with the district court that the parties "did not agree to a specific sales price and they did not know the monetary worth of the vehicle when Endeavor used the Navigator," and that "the parties did not designate any terms o[r] conditions of a sales agreement that were to occur at any specific time." Aplt. App. at 371.[7]

_____

[7] In support of its conclusion that the agreement did not satisfy the terms of the policy, the district court cited eleven facts, and United appears to adopt them in full. Several of these facts are irrelevant. For one, the absence of a written agreement matters not, as New Mexico recognizes oral contracts and no one has invoked the statute of frauds. *See, e.g.*, *Varoz v. Varoz*, 183 P.3d 151, 154 (N.M. 2008). For another, lack of a down payment or monthly payments on the vehicle has no bearing, for neither are required of a conditional sale. Finally, the district court noted a series of facts relating to the vehicle's insurance, all essentially boiling down to the fact that Mr. Cooper continued to insure the car
(continued...)

18

Under New Mexico law, "[i]ndefiniteness can defeat a contract claim in two ways." *Padilla v. RRA, Inc.*, 946 P.2d 1122, 1125 (N.M. Ct. App. 1997). "First, indefiniteness can indicate that the parties failed to reach an agreement." *Id.* Second, it can result in a situation in which there is no "basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* (quoting Restatement (Second) of Contracts § 33(2) (1981)) (internal quotation marks omitted). There is no real contention here that the parties failed to reach an agreement. Indeed, Messrs. Woods and Cooper described the agreement in nearly identical terms: Endeavor would take the car, use it, and maintain it, while Mr. Cooper retained the title, and Endeavor would pay the Blue Book value for the vehicle once it had the funds to do so.

The question, then, is whether there is a sufficient basis for ascertaining a breach and remedying it. Asking that question first in regards to the price term, Mr. Cooper testified that under the agreement "the amount was undetermined. We'll just look and see what the Blue Book value was, and just do a fair value." Aplt. App. at 259. In his own deposition, Mr. Woods agreed that Endeavor would pay fair market value for the vehicle, and implied that he considered the Blue

---

[7](...continued)
while Endeavor possessed it. However, the policy only required that the vehicle be *under* a conditional sale—*viz.*, that an agreement have been reached to conditionally sell the car. The fact that Mr. Cooper continued to take care of various insurance-related responsibilities has nothing to do with the focal point of our inquiry.

Book to reflect that value. Thus, the parties shared an understanding of the

*source* of the valuation: the worth of the Navigator on the market, as calculated

by the Blue Book.[8]

The only reason to find the price term indefinite, then, is that neither party

had a precise value in mind when they reached the agreement. Where price terms

referring to fair market value have been regarded as indefinite, it has been

because the *methodology* used to determine fair market value was uncertain. *See,*

*e.g.*, *Teutul v. Teutul*, 912 N.Y.S.2d 664, 665 (N.Y. App. Div. 2010); *Four Eights,*

*LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005); *Playoff Corp. v.*

*Blackwell*, 300 S.W.3d 451, 456–58 (Tex. App. 2009). Where there is no such

problem and the methodology is clear, indefiniteness is not an issue. *See, e.g.*,

*Goodwest Rubber Corp. v. Munoz*, 216 Cal. Rptr. 604, 604–05 (Cal. Ct. App.

1985) (collecting cases and concluding that "text writers and courts . . . are in

general agreement that 'fair market value,' 'reasonable value,' or 'current market

value,' are sufficiently certain price terms to support specific performance of an

option"). The methodology here was simply opening up the Blue Book and

checking the value. There is nothing uncertain or indefinite about that. *See, e.g.*,

---

[8] Neither the district court nor United appears to believe there is any ambiguity as to when the valuation of the vehicle would be done, i.e., whether it was the time the agreement was entered or the time payment was made. At the very least, there does not appear to be a sufficient basis to rule in United's favor on that question.

20

*Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 n.5 (9th Cir. 1986) (acknowledging the Blue Book as "the standard reference for prices of" vehicles), *overruled on other grounds by Yee v. City of Escondido*, 503 U.S. 519, 537 (1992).

Having resolved the price-term issue, we have only the time-for-performance matter to contend with. Messrs. Woods and Cooper testified that Endeavor would pay for the Navigator at fair market value as soon as the company had the funds to do so. The question of whether this is sufficiently definite goes to whether it would have been possible for a court to determine the existence of a breach (the remedy would be fixed according to the Blue Book). To be sure, a court might not have a surefire means to know exactly how much funds were enough to hold that Endeavor had a duty to pay for the Navigator. Nevertheless, such a determination is not so dissimilar to the sort of reasonableness calculations courts make on a daily basis. *See, e.g.*, *State v. Whitaker*, 797 P.2d 275, 282–83 (N.M. Ct. App. 1990) (interpreting a statute to require state trial courts to determine "the extent that the defendant is reasonably able" to pay restitution). For summary-judgment purposes, it cannot be said that the conditional-sale agreement was void for indefiniteness simply because its time for performance was tied to Endeavor's ability to pay for the vehicle. Therefore, the district court erred in granting summary judgment to United on its claim that the exclusion did not apply.

21

**B**

We turn next to American's commercial umbrella policy. The district court ruled that the umbrella policy covered the accident and that its exclusion for damages arising from the use of controlled substances was inapplicable. We again take a different view and find that summary judgment on this issue was improperly granted.[9]

American's umbrella policy excluded coverage for damages "[a]rising out of the use . . . or possession by any person of a controlled substance." Aplt. App. at 105. In agreement with the district court, United submits that "arising out of" is ambiguous. We discern no ambiguity and, applying the unambiguous definition of the phrase, conclude that United was not entitled to a summary-judgment resolution of the issue in its favor. As before, we first address facial ambiguity and then as-applied ambiguity.

**1**

It is clear what "arising out of" means in the area of *coverage* provisions in insurance policies. In that area, the phrase "is given a broad interpretation by [New Mexico] courts and is generally understood to mean 'originating from,' 'having its origin in,' 'growing out of[,]' or 'flowing from.'" *City of*

_____

[9] In their briefs, the parties discuss whether Mr. De La Paz was an insured under the policy. Because we conclude that United was not entitled to summary judgment on the exclusion issue, we need not and do not address this debate.

22

*Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 213 P.3d 1146, 1153 (N.M. Ct. App. 2009) (alteration in original) (quoting *Krieger v. Wilson Corp.*, 131 P.3d 661, 666 (N.M. Ct. App. 2005)) (internal quotation marks omitted). What is less clear is what the phrase means in an *exclusionary* provision. Nonetheless, though the New Mexico courts have been less vocal on that question, they have not been silent.

We can begin with the proposition that "arising out of" is not facially ambiguous just because it appears in an exclusion. *See Lopez v. N.M. Pub. Sch. Ins. Auth.*, 870 P.2d 745, 747 (N.M. 1994) (holding that "the provisions for coverage or exclusions are not ambiguous, that the policy covers only claims for personal injury, and that it specifically excludes coverage for all claims arising from"—a phrase in an exclusion from an endorsement—"sexual misconduct"); *see also Askew v. Miller Mut. Fire Ins. Co. of Tex.*, 522 P.2d 574, 575 (N.M. 1974) (describing an exclusion that contained an "arising from" clause as "clear and unambiguous").

If "arising out of" is not facially ambiguous in an exclusion, it presumably has a definition. The New Mexico Supreme Court established that definition in 1993. At that time, the court reviewed an insurance policy with an exclusion stating that the policy would not apply "[t]o liability of the insured arising out of the performance of a criminal act." *N.M. Physicians Mut. Liab. Co. v. LaMure*, 860 P.2d 734, 736 (N.M. 1993) (alteration in original) (internal quotation marks

23

omitted).  In unequivocal language, the *LaMure* court noted that neither the coverage clause nor the exclusion was "ambiguous because they can be reasonably construed in only one way—liability from 'rendering professional services' is covered unless it *stems* from 'criminal acts.'"  *Id.* at 737 (emphasis added).  "Stems" is plainly a broad word of the same ilk as "originating from," "having its origin in," "growing out of," or "flowing from."  *See Webster's*, *supra*, at 2235 (defining "stem," in relevant part, as "to grow out" and "to have or trace one's origin or development"); *Black's*, *supra*, at 122 (defining "arise" as "[t]o originate; to stem (from)").

An earlier decision by the New Mexico Court of Appeals also suggests a broad approach to interpreting "arising out of" in the context of exclusions.  *See Baca v. N.M. State Highway Dep't*, 486 P.2d 625 (N.M. Ct. App. 1971).  The court there had before it the following language:

> B.  EXCLUSION OF HIGHWAYS
>> It is agreed that the policy does not and shall not be construed to cover any liability arising solely from the existence of or condition of highways, streets, roads or other dedicated ways, including bridges, culverts and similar structures appurtenant thereto.
>> This exclusion does not apply to accidents arising out of construction, maintenance or repair operations undertaken by or on behalf of the named insured.

*Id.* at 627 (internal quotation marks omitted).  The court then analyzed the language:

> Excluded from coverage under the first paragraph of B is

24

> ". . . liability arising solely from the existence of or condition of highways, . . . ." The accident involved, at least for the purpose of summary judgment, arose from the condition of the highway, namely, the lines which confused and misdirected the driver of the car in which plaintiffs were riding. This exclusion, however, is inapplicable under the second paragraph of B, ". . . to accidents arising out of construction, maintenance or repair operations . . . ." The words "arising out of" are very broad, general and comprehensive terms, ordinarily understood to mean "originating from," "having its origin in," "growing out of" or "flowing from."

*Id.* at 628 (omissions in original). There are two noteworthy things about *Baca* for our purposes. First, it explicitly applied a broad definition of "arising out of" to language in an exclusion. Though that language was in an *exception* to an exclusion, this at least suggests that there is no categorical distinction between exclusions and coverage with respect to the phrase. If "arising out of" had a different definition in exclusions than it does in coverage, one would have expected the *Baca* court to have said so. Second, the court applied the "arising out of" term within the same paragraph in which the court defined it broadly. The New Mexico Court of Appeals thereby strongly implied that it was using the broad meaning it contemporaneously provided. In short, we have every reason to suppose that New Mexico law applies the same broad definition of "arising out of" in the exclusion context as in the coverage context.

## 2

We are then tasked with determining whether the "arising out of" clause is ambiguous as applied. As an initial matter, there is nothing in the policy that

25

would render it so, and no one has ever claimed otherwise. With that established, one need only actually apply the definition discussed above to the facts to see that there is no ambiguity. The controlled-substance exclusion applies if the accident originated from, had its origin in, grew out of, flowed from, or stemmed from Mr. De La Paz's use of methamphetamine. *See BPLW Architects*, 213 P.3d at 1153; *LaMure*, 860 P.2d at 737. There can be no serious doubt that this test is satisfied.

Dr. Morrisett expressed the view that "Mr. [De La Paz's] methamphetamine intake substantially contributed to the motor vehicle accident." Aplt. App. at 152. Accepting Dr. Morrisett's uncontested opinion as true for summary-judgment purposes (as we must, and as United itself does), the accident self-evidently originated from, flowed from, or stemmed from the methamphetamine use.[10]

## C

---

[10] The only other supposed "evidence" concerning the cause of the accident that anyone has ever pointed to is Mr. Woods's estimation of the distance between Mr. De La Paz's home and the site of the accident and the fact that conditions were clear, and the road straight, level, and flat. But there is nothing in the record aside from rank speculation from counsel and the district court as to whether or not any of these facts has any bearing on the link between the drugs and the accident. Likewise, the district court theorized that "a number of other factors leading to De La [Paz's] inattentive and dangerous driving could have caused the collision," Aplt. App. at 379, such as that he "fell asleep at the wheel, was texting or talking on a cell phone, spilled a cup of hot coffee on his lap," and so on, *id.* at 378. Perhaps these factors did play a role in what happened, but there is certainly no evidence of any of them in the record. And even if we accepted that any of this free-ranging speculation constituted evidence, it would have to yield to the conflicting evidence adduced by American, the nonmovant.

Our review alights finally on the Great West policy. That policy covered hired and nonowned autos. The Great West policy defined nonowned autos as "[o]nly those 'autos' you do not own, lease, hire, rent or borrow that are used in connection with your business." Aplt. App. at 128.[11] By its plain terms, the provision sets forth two criteria that must be satisfied in order for a vehicle to be considered nonowned: (1) that it not be owned, leased, hired, rented, or borrowed, and (2) that it be used in connection with the business of the insured. Contrary to the district court, we do not think summary judgment in United's favor is justifiable on either question[12] and therefore reverse the district court insofar as it

---

[11]     The next sentence in the provision notes that "nonowned autos" "includes private passenger type autos owned by your employees, partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business." Aplt. App. at 128 (internal quotation marks omitted). We do not read this non-exhaustive list of examples as expanding or contracting coverage, and we do not find it relevant here.

[12]     The district court suggested that American's argument regarding the nonowned-vehicle clause had been "abandoned" because American did not raise it in its *reply* to United's opposition to its motion for summary judgment, Aplt. App. at 383, even though American did articulate the argument in the motion for summary judgment itself. Though we have refrained from reviewing "*newly raised legal theories*," *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (emphasis added), we have never held a theory forfeited simply because it was omitted from a *reply* brief. Given that a reply is typically optional, given that one does not appear to have been required here by either the court or the local rules, *see* D.N.M.LR-Civ. 7.1(b), and given that the district court did address the question on the merits, we do not consider the argument "abandoned" in the district court.

27

held at summary judgment that the Great West policy was not implicated.[13]

To treat the second criterion first, the vehicle was unquestionably being used in connection with the business of the insured, Endeavor: it was being driven by an Endeavor salesman to pick up an Endeavor check.[14]

We move then to the first criterion—that the insured "not own, lease, hire, rent, or borrow" the vehicle. It is easiest to break the list up into two parts: (1) ownership, and (2) the rest. The district court thought the car had been borrowed. We think not. "Borrowing"—as well as "leasing, hiring, and renting"—implies temporary possession and the anticipated or at least potential ultimate return of the object to the original owner. *See Webster's*, *supra*, at 256 (defining "borrow" as "to receive *temporarily* from another" (emphasis added)); *id.* at 1286 (defining "lease" with reference to "any *less* interest than that of the lessor" (emphasis added)); *id.* at 1072 (defining "hire" as "to engage the *temporary* use of" (emphasis added)); *id.* at 1923 (defining "rent" with reference to "*use*" (emphasis added)). There was nothing temporary about the arrangement here. Messrs.

---

[13]    Because we find summary judgment for United improper on the nonowned-auto issue, we will not address the hired-auto question.

[14]    United cites *Union Standard Insurance Co. v. Hobbs Rental Corp.*, 566 F.3d 950 (10th Cir. 2009), on the applicability of the nonowned-auto clause. *Hobbs* interpreted similar insurance-policy language under New Mexico law in a case where an independent contractor hired by the insured was seeking the benefit of the clause. *See* 566 F.3d at 951. Here, there is no dispute that Endeavor is the insured, that Mr. De La Paz was an Endeavor employee, and that he was conducting company business with the car when he crashed. *Hobbs* is inapposite and has no bearing on our decision.

28

Cooper and Woods offered uncontroverted testimony that Endeavor and Mr. Cooper both understood that Endeavor would keep the car permanently.

Ownership presents a more complicated matter. If New Mexico law deems Endeavor (the named insured) to be the car's owner under these circumstances, then the district court correctly concluded at summary judgment—albeit for different reasons—that Great West's nonowned-auto policy provision did not give coverage to Endeavor. However, we conclude that the district court's summary-judgment ruling as to this provision was erroneous because we predict that the New Mexico Supreme Court would consider the question of Endeavor's ownership of the car to be a jury question.

At the outset, we observe that our research has not uncovered any New Mexico cases that have addressed the ownership issue presented here in the specific context of a conditional-sales agreement. It follows perforce that New Mexico law has not specifically established that a putative vendee in such an agreement (here, Endeavor) should be deemed the owner.

Furthermore, the decisions in other jurisdictions do not paint a clear and symmetrical picture of what weight to attach to such agreements in the ownership inquiry. *Compare In re Succession of Dunham*, 408 So. 2d 888, 896–97 (La. 1981) (ownership passes when contract entered into), *with Lynch v. U.S. Branch, Gen. Accidental Fire & Life Assurance Corp.*, 327 F.2d 328, 331 (4th Cir. 1964) (holding that "equitable title and ownership" pass with the transfer of possession

29

while the seller retains "a security interest in the property secured by the retention of legal title for that purpose only"), *and Burroughs Adding Mach. Co. v. Wieselberg*, 203 N.W. 160, 162 (Mich. 1925) (ownership passes when payment made).

Given this uncertainty, we cannot confidently predict that the New Mexico Supreme Court would feel compelled to move beyond its general understanding of the ownership issue in the insurance setting to adopt a specific rule for conditional-sales agreements. *Cf. Ag. Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 735–36 (10th Cir. 2000) ("We do not believe that it is our position to predict that the New Mexico Supreme Court would overrule its precedent in the complete absence of any indication *from that court* of its inclination to do so."). And its general understanding leads to the conclusion that, under the circumstances of this case, the district court should have reserved the question of whether Endeavor was the owner of the car for the jury. *See Knotts v. Safeco Ins. Co. of Am.*, 432 P.2d 106, 109 (N.M. 1967).

In *Knotts*, the New Mexico Supreme Court reversed a trial court that had taken an insurance dispute away from the jury on the ownership question. *Id.* at 106. The court acknowledged that, under New Mexico precedent, title is prima facie evidence of ownership,[15] but the intent of the parties (i.e., buyer and seller),

---

15   *See Clovis Fin. Co. v. Sides*, 380 P.2d 173, 176 (N.M. 1963) (noting
(continued...)

30

as embodied in the contract, ultimately determines when ownership passes.[16] *See id.* at 108–09. In reaching its conclusion that the appellant's ownership *vel non* should be resolved by the jury, the court found that "the situation before [it]" was not just a circumstance of "naked possession without documentary evidence of title." *Id.* at 109. To support this finding, the court seemed to rely (albeit tacitly) on the fact that the appellant extensively and exclusively used the vehicle during the relevant period and made significant payments toward the full purchase of the vehicle. *See id.* at 107.

Like *Knotts*, this is not a "situation" of simply "naked possession" without evidence of title by Endeavor. *Id.* at 109. Endeavor exclusively used the car during the relevant period and paid for all of the gas and maintenance for it, even though Mr. Cooper retained the title. Moreover, while Endeavor had not yet paid for the vehicle, the conditional-sales agreement clearly evinced the parties' intention that it ultimately would do so. In light of *Knotts*, we cannot conclude that "reasonable minds could not differ" regarding whether Endeavor owned the vehicle at the time of Mr. De La Paz's accident. *Id.* at 108. Consequently, we

---

[15](...continued)
that a car's title is "prima facie evidence of ownership"); *see also* N.M. Stat. Ann. § 66-3-12 ("A certificate of title . . . shall be received in evidence as prima facie evidence of the ownership of the vehicle named in the certificate . . . .").

[16]    *See Schall v. Mondragon*, 393 P.2d 457, 461 (N.M. 1964) ("Since New Mexico does not require an exclusive or mandatory method of transferring title to an automobile, it therefore follows that title and ownership pass when the parties intend it to pass.").

conclude that the district court erred in granting summary judgment to United on the ground that Great West's policy did not—as a matter of law— provide coverage to Endeavor.

## IV

For the reasons noted, we **REVERSE** the district court's order granting summary judgment to United and **REMAND** for further proceedings.[17]

Entered for the Court

JEROME A. HOLMES
Circuit Judge

---

[17] Endeavor also had an excess-liability policy with United, and the American umbrella policy had an excess-liability clause. By definition, the import of the excess-liability provisions is intertwined with the coverage afforded by the primary policies. Because we are remanding for further proceedings regarding the primary policies, we decline to address the excess-liability provisions. The district court will consider and interpret those provisions as it deems necessary on remand in light of our holdings and in light of any further proceedings it conducts.